**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANDREW SOJKA, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 2:26-cv-1928 |
| ANTHONY LETIZIO, DO, | ) | |
| BETHANY FIESS | ) | |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Andrew Sojka, by his attorneys at the Mizner Law Firm, files this Complaint and states as follows:

**A. Parties.**

1.      Plaintiff Andrew Sojka is an adult individual who is currently incarcerated at the State Correctional Institution at Phoenix ("SCI Phoenix"), located at 1200 Mokychic Drive, Collegeville, Pennsylvania 19426.

2.      Defendant Anthony Letizio, DO, is an adult individual who at all relevant times was the site medical director at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, Pennsylvania 19426. At all relevant times, Dr. Letizio was acting under color of state law, and a professional negligence claim is being asserted against him.

3.      Defendant Bethany Fiess is an adult individual who at all relevant times was the clinical coordinator at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, Pennsylvania 19426. At all relevant times, Ms. Fiess was acting under color of state law, and a professional negligence claim is being asserted against her.

1

**B. <u>Jurisdiction and Venue</u>**

4.      This Complaint includes claims made pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983.

5.      This Honorable Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

6.      This Complaint also includes pendent state law claims, over which this Honorable Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within the territorial jurisdiction of this District and the Defendants are subject to personal jurisdiction within this District.

**C. <u>Facts</u>**

8.      A hernia is defined as an organ or other tissue being forced through a weak spot in the abdominal wall. A hernia is known as "inguinal" when intestines, fat or other tissue contents of the abdomen enter into the groin area, where the lower abdomen meets the inner thigh. Throughout the course of a hernia, tissue may recede back into the abdomen and then bulge out again, depending on a number of factors including body position and activity levels.

9.      Inguinal hernias are the most common type of hernia. Inguinal hernias can cause severe pain in men if the internal tissue is forced into the scrotum and impacts the testicles.

10.     Hernias impacting the groin area (i.e., inguinal and femoral hernias) are very common—the prevalence of groin hernias has been estimated to be between five and ten percent (5-10%) in the United States.

11.    The estimated lifetime risk of developing a groin hernia is about twenty-five percent (25%) in men.

12.    Inguinal hernias can cause severe pain. The level of pain usually increases during and/or after activity or exertion.

13.    Typically painless and ordinary activities of daily living such as walking, running, lifting, coughing, urinating, defecating, or even sitting up can cause herniated tissue to bulge out of the abdominal wall, causing intense and excruciating pain.

14.    Hernias may become so painful that they prevent patients from engaging in any activities, even leaving a suffering patient bedridden.

15.    Other symptoms of inguinal hernias include weakness, feelings of heaviness, burning, tearing, or aching in the groin; or a swollen or enlarged scrotum.

16.    A hernia that is left without surgical repair can cause serious complications.

17.    One of the most serious hernia complications is when the intestines bulge through the abdominal wall and become trapped in the scrotum, or outside the abdominal wall.

18.    This condition is a medical emergency which can lead to bowel obstructions, tissue necrosis, sepsis, the excision of intestines, and even death.

19.    Although a larger hernia may visually appear "worse," in fact there is no correlation between hernia size, and the amount of pain it can cause.

20.    A patient may experience much more pain with a small hernia than a large hernia, or vice versa.

21.    A hernia that can be "pushed back" into the body is referred to as "reducible." Many times, however, the bulging tissue of the hernia becomes trapped and cannot be pushed back into place—this is a non-reducible, or "incarcerated" hernia.

3

22.     Reducible hernias can be even more painful than non-reducible hernias. Hernias may be reducible at times and non-reducible at others, and a reducible hernia can become permanently non-reducible, or "incarcerated," at any time.

23.     An inmate with a hernia may face unique challenges.  For example, there are times when an inmate simply does not have the freedom to lie down on the ground to push his intestines back into place. This can become necessary at any time for a patient with a hernia, whenever the hernia bulges out of the abdominal wall.

24.     If an incarcerated hernia is untreated, it can at any time become "strangulated," meaning the blood supply to the bulging tissue is cut off, causing the tissue to die. When this happens, the tissue dies.

25.     Strangulation is an emergency situation, requiring immediate surgery to correct the condition.

26.     Failure to treat a strangulated hernia can lead to severe infection, intestinal obstruction, the excision of intestines, and death.

27.     Hernias are usually diagnosed with a  physical exam, in conjunction with a review of the patient's medical history. X-rays, CT scan, or ultrasound testing may be helpful, but are not conclusive - a negative scan does not mean that no hernia is present.

28.     A hernia belt, or truss, can temporarily relieve hernia discomfort if it fits properly. It does not heal the hernia.  It does not eliminate the risk of strangulation.

29.     Most patients find a truss unsatisfactory and do not wear them.

30.     The *only* treatment that can correct an inguinal hernia is surgical repair.

4

31. The tear or weakness in the abdominal wall which permits the tissue to bulge through cannot heal on its own. Therefore, a patient will continue to suffer from intense pain, discomfort, and limited activity until corrective surgery is performed.

32. Failing to provide corrective surgery also leaves a patient vulnerable to other complications, including the risk of infection, intestinal obstruction, and death.

33. The risk of developing complications increases the longer a hernia is left untreated.

34. The correct first step in hernia treatment is referral to a surgeon for consultation. Corrective surgery is generally recommended for patients with hernia who are experiencing any of the following symptoms: pain, an inability to walk, an inability to work or engage in other normal life activities, or other symptoms.

35. The medical standard of medical care for symptomatic hernias is surgical repair.

36. This surgery should be conducted as soon as possible after the hernia is detected.

37. Basing the decision to perform surgery on whether the hernia is reducible, irrespective of other symptoms, falls far below accepted medical practice and the standard of care.

38. Surgical repair of inguinal hernias is one of the most common surgeries performed in the United States, and it is a relatively simple procedure.

39. More than one million abdominal wall hernia repairs are performed each year in the United States, with inguinal hernia repairs constituting nearly 770,000 of these cases.

40. Although hernia surgery is typically referred to as "elective," that designation has no bearing on whether the condition it will alleviate is a serious medical need.

41. Any procedure that is not an emergency can be classified as elective.

5

42.     An elective surgery only means there is sufficient time to schedule the surgery as opposed to going into surgery immediately on an emergent basis; this does not mean that failure to perform the surgery is not below the standard of care, indeed it is, and it does not mean the condition will not result in severe pain and other serious complications, because it can.

### Mr. Sojka suffering due to inadequate medical care.

43.     Mr. Sojka was incarcerated at SCI Phoenix at all times relevant to this Complaint.

44.     As such, he was and is completely dependent upon the medical staff to provide him with necessary medical care; he has no ability to obtain such care himself.

45.     On February 14, 2024, Mr. Sojka was seen by PA Elliott Yodh in the prison medical department, reporting that he felt a bulge in his stomach which had occurred while he was working out.

46.     The bulge enlarged when he defecated or coughed, which PA Yodh observed.

47.     PA Yodh assessed him with a left inguinal hernia, provided him an abdominal binder, and submitted an ultrasound consultation.

48.     The request was reviewed and approved by Dr. Anthony Letizio, the site medical director, on February 19, 2024.

49.     The ultrasound was scheduled for April 30, 2024.

50.     On February 20, 2024, Mr. Sojka presented to PA Yodh again, because his abdominal binder was not effective, and was rising above his hernia site every time he walked. He returned the binder, and was issued a surgical truss.

51.     On February 26, 2026, Mr. Sojka presented to Ashley Senkowski, CRNP in the medical department, reporting ongoing constipation and urinary issues.

52.    CRNP Senkowski wrote, "Last bowel movement was six days ago.  Reports it feels like he is unable to urinate at times.  Also with complaints of growing left inguinal hernia."

53.    She observed a golf-ball sized hernia while he was lying down, and prescribed Miralax and Senna for his constipation, noting that an ultrasound had already been ordered and scheduled.

54.    On April 10, 2024, Mr. Sojka reported to Stephanie O'Neill, RN, that his hernia was "almost down to my balls."

55.    On April 23, 2024, Mr. Sojka was seen by Susan Miller, CRNP, who noted he was having difficulty urinating, with poor urinary stream and urinary urgency. Her treatment plan was for Tamsulosin, a medication to treat prostate related urinary issues.

56.    CRNP Miller added an addendum to her note: "appropriate personnel notified regarding hernia repair surgery - was cancelled and will need to be rescheduled."

57.    It is not clear what CRNP Miller meant by this addendum, as there is no other note indicating that Mr. Sojka had been either scheduled for surgery, or that his surgery had been canceled.

58.    Indeed, to that point he had never even seen a surgeon for his hernia, much less been scheduled for the procedure itself.

59.    On April 30, 2025, Mr. Sojka underwent an ultrasound which confirmed his left inguinal hernia.

60.    On June 21, 2024, he saw CNRP Miller, who noted his hernia was going further into his scrotum and causing more pain especially when getting out of bed in the morning.

61.     CNRP Millers' treatment plan was to enter a consultation request for general surgery.

62. Site medical director Dr. Letizio reviewed her consultation request on June 24, 2024. However, there is no indication the consult was ever approved.

63. On August 25, 2024, Mr. Sojka was seen by CRNP Senkowski at his cell door, for complaints for ongoing hernia pain. The visit deteriorated as Mr. Sojka was extremely frustrated and upset about being offered an "alternative treatment plan" for his hernia.

64. CRNP Senkowski recorded under the "plan" portion of her SOAP note:

Patient was yelling and cursing at the provider, stating there is no alternative treatment for hernias.  Informed the patient that he had been given Miralax and Senna as an alternative treatment.  The patient began yelling and told the provider those medications do not work as an alternative.  The provider attempted to educate the patient on hernias but was unable to speak as the patient continued to yell and curse over the provider.  Provider then ended the visit with the patient calling the provider "a fucking bitch."

65. While Mr. Sojka's language to CRNP Senkowski was unacceptable, his frustration and anger was real and completely justified: from a medical standpoint, there is no such thing as an "alternative treatment" for an inguinal hernia, and the providers' failure to provide him with a referral for surgical repair was unacceptable and inexcusable.

66. On September 16, 2024, Mr. Sojka was seen at his cell door by CRNP Senkowski, who noted his inguinal hernia was "squeezing and twisting" his testicle.

67. She wrote, "has been using conservative treatment, including Miralax and senna, stating these medications are not effective, reported compliance.  General surgery consult was ATP'd in June 2024 to evaluate effectiveness of conservative measures."

68. In other words, Dr. Letizio had decided not to proceed with a surgical consultation in June, in favor of using "alternative treatment."

8

69. However, even through the cell door CRNP Senkowski was able to see the mass in Mr. Sojka's left groin, and noted "appears to be larger than the 2.7 cm hernia identified on ultrasound in May 2024.  The patient is unable to reduce hernia."

70. Therefore, her treatment plan was to "discuss with the Site Medical Director possible general surgery consultation due to non-effectiveness of conservative treatment options. Will order Voltaren" a pain and inflammation medication.

71. On September 17, 2024 - seven months after the inguinal hernia was originally diagnosed, and three months after CRNP Senkowski first submitted a surgical consultation request - she submitted a new general surgery consultation request, which was approved by Dr. Letizio and scheduled for four months later, on January 3, 2025.

72. On October 24, 2024, CRNP Miller noted that Mr. Sojka was having hernia pain, and that it was difficult for him to work in the kitchen due to the hernia.

73. As a result,  CRNP Miller put him on a work restriction for four months.

74. On November 19, 2024, Dr. Pinky Bora Saikia put an addendum in Mr. Sojka's medical chart: "pending surgical evaluation for inguinal hernia - office made aware verbally about the need to schedule."

75. This addendum indicated that more than two months since Dr. Letizio approved the surgical consultation, it had not yet been scheduled.

76. On January 14, 2025, Dr. Letizio referred Mr. Sojka for general surgery to repair the inguinal hernia, noting,

> "Inmate with left groin hernia confirmed by General Surgeon and Urology that initially went into the inguinal canal and then down into the scrotum.  The hernia is now getting larger with complaints of constipation and difficulty urinating from time to time.  He  is able to push the hernia back at time which helps him deal with the pain.  Inmate now with fullness in the left tesicle where the hernia sac ends.  The inmate is scheduled for the

9

surgery with general surgery and urology being present to complete the procedure. Asking for approval of the surgery."

77. This referral was made eleven months after the hernia was first diagnosed.

78. However, the hernia repair was not scheduled for several months.

79. During his consultation with the general surgeon on January 4, 2025, Mr. Sojka's prison providers were directed to obtain a CT of the abdomen and pelvis without contrast, to aid in the surgery.

80. To obtain this CT, Mr. Sojka was added to the CT clinic on January 23; however, the appointment was cancelled because of an equipment failure.

81. Thereafter, all CTs were canceled until May 2025.

82. Then, on May 15, 2025, all CTs and MRIs on site at the prison were cancelled until further notice.

83. Within DOC facilities, all outside medical appointments and surgical procedures which are approved by the site medical director must be actually scheduled by the clinical coordinator. If the clinical coordinator does not promptly schedule outside appointments for prisoners including Mr. Sojka, the appointments do not occur.

84. The clinical coordinator at SCI Phoenix was Ms. Bethany Fiess.

85. Ms. Fiess was subject to internal policies which required outside medical appointments to be scheduled within thirty (30) days, if not earlier as indicated by the ordering medical provider.

86. However, Ms. Fiess failed to comply with her duty to timely schedule Mr. Sojka's surgery after it was approved by Dr. Letizio on January 14, 2025.

10

87.    On March 26, 2025, over two months after Mr. Sojka was approved for surgery, the prison Ms. Fiess noted that she was working on scheduling surgery with Dr. Schermer's office.

88.    This is the first indication in the medical records, that any attempt had been made to schedule Mr. Sojka's surgery.

89.    However, on April 1, 2025, Mr. Sojka was mistakenly scheduled for another surgical consultation to take place on May 23, 2025 by Ms. Fiess, rather than the corrective surgery itself.

90.    This mistake was apparently not caught by the prison staff until April 30, 2025, when Ms. Feiss called Dr. Schermer's office to clarify that Mr. Sojka needed to be scheduled for surgery, not a consultation.

91.    Finally, Mr. Sojka was scheduled for surgery on May 22, 2025, with Dr. Shermer, over five months after it was first approved by Dr. Letizio.

92.    His providers at the prison failed to obtain a CT of his abdomen prior to the surgery.

93.    Nonetheless, Mr. Sojka underwent surgery on May 22, 2025, which successfully repaired the hernia without incident.

94.    He was discharged from the prison infirmary back to his housing unit on May 23, 2025.

95.    In sum, it took over fifteen months from the time Mr. Sojka's hernia was diagnosed, until it was finally repaired.

11

96.    This delay was caused by the medical provider's failure to timely schedule surgical repair of his hernia, despite their knowledge that surgery was the only appropriate treatment for his injuries.

**Exhaustion of Administrative Remedies.**

97.    On March 28, 2025, Mr. Sojka submitted a grievance against his medical providers, writing in part:

> I was diagnosed with a hernia late Feb early March of 2024. The medical dept. Here at SCI PHX blatantly lied to me about treatment for (7) seven months claiming that they were going to try "alternative methods" to fix my hernia. There was not 1 time during those 7 months that I saw a doctor nor was there any treatment. Nothing was done despite all the sick calls & requests. In my opinion, they were hoping I got paroled in Aug. of 24 so they didn't have to deal with it…. The Dr. at Einstein explained to me that there's no such thing as an alternative fix, joking "maybe prayer or a miracle."

98.    On April 7, 2025, Mr. Sojka's grievance was denied by the grievance coordinator, who wrote "You currently have a pre-operative consult appointment scheduled for the surgery. In light of this information, your grievance is denied and all request for relief is denied."

99.    In other words, Mr. Sojka's grievance was denied on the grounds he already had a consultation scheduled, when in reality that consultation was the result of a mistake: he had already been approved for surgery, but instead had been scheduled for simply another consultation!

100.    Mr. Sojka timely appealed, but his appeal was denied by the Facility Manager on May 5, 2025, on the basis that "you have not provided evidence to substantiate your claims. A consult is scheduled in the near future."

101.    Mr. Sojka timely appealed again, and received a final denial of his grievance from SOIGA on June 25, 2025.

12

102. As such, Mr. Sojka has exhausted his administrative remedies, and his claims are ripe for adjudication by this Honorable Court.

## COUNT I - DELIBERATE INDIFFERENCE IN VIOLATION OF THE EIGHTH AMENDMENT

*Andrew Sojka*
*v.*
*Anthony Letizio, DO*

103. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

104. Dr. Letizio knew of Mr. Sojka's serious medical needs.

105. Despite this knowledge, Dr. Letizio intentionally denied Mr. Sojka individualized care and has intentionally delayed treatment that was necessary to address his serious medical needs.

106. Dr. Letizio caused the wanton infliction of pain and thus exhibited deliberate indifference to the serious medical needs of Mr. Sojka, in violation of the Eighth Amendment.

107. By denying Mr. Sojka individualized care and treatment of his hernia consistent with the medical standard of care, Wellpath have imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

108. Dr. Letizio's failure to timely provide Mr. Sojka's medically-necessary hernia surgery violates all standards of decency, contrary to the Eighth Amendment.

WHEREFORE, Plaintiff Andrew Sojka seeks judgment in his favor and against Dr. Anthony Letizio in an amount in excess of $75,000, along with all other relief permitted by law.

## COUNT II

## PROFESSIONAL NEGLIGENCE

*Andrew Sojka*
*v.*
*Anthony Letizio, DO and Bethany Fiess*

109.    The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

110.    As Mr. Sojka's treating medical provider, Dr. Letizio, owed a duty of care to Mr. Sojka to ensure that he was referred for a surgical consultation, and provided corrective surgery if recommended by the examining surgeon.

111.    Another aspect of this duty was to provide Mr. Sojka with the minimum standard of care required for someone in his condition and with his medical needs.

112.    The standard of care for someone in Mr. Sojka's condition is to be referred to a surgeon for a consultation, and to follow the recommendation of the surgeon which is usually to surgically repair the inguinal hernia.

113.    Dr. Letizio failed and refused to ensure Mr. Sojka was referred to a surgeon for a consultation and to follow the recommendation of the surgeon in a timely manner.

114.    The medical care, diagnosis, treatment and services rendered by Dr. Letizio, was performed in a negligent and careless manner and not in accordance with professional standards required of the conditions presented by Mr. Sojka.

115.    Dr. Letizio failed to possess and/or exercise adequate medical skills, knowledge, experience and techniques for the proper treatment of Mr. Sojka.

116.    In addition, clinical coordinator Bethany Fiess owed a duty to Mr. Sojka, to ensure that his outside medical care, including his corrective surgery, was scheduled in a timely manner; which per her employer's policy meant within thirty days.

14

117.    Ms. Fiess failed to take reasonable action to timely schedule Mr. Sojka's surgery, and as a result he was not scheduled for surgery until more than five months after his surgery was approved.

118.    Ms. Fiess' negligent failure to timely schedule Mr. Sojka's surgery is without legal justification or excuse, and caused him to unnecessarily suffer for four additional months after his surgery was approved.

119.    As a direct and proximate result of the negligence by Dr. Letizio and Ms. Fiess, Mr. Sojka has continued to suffer severe injury and pain, and lives with constant risk of greater injury.

120.    As a direct and proximate result of the negligence by Dr. Letizio and Ms. Fiess, Mr. Sojka has experienced pain and suffering and loss of life's pleasures.

121.    As a direct and proximate result of the negligence by Dr. Letizio and Ms. Fiess, Mr. Sojka has experienced pain and suffering, inconvenience, limitation on activities of daily living, mental anguish, and humiliation and embarrassment.

WHEREFORE, Plaintiff Andrew Sojka seeks judgment in his favor and against Dr. Anthony Letizio and clinical coordinator Bethany Fiess in an amount in excess of $75,000, along with all other relief permitted by law.

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ Joseph P. Caulfield, Esq.

Joseph P. Caulfield
PA Bar No. 322823
jpc@miznerfirm.com

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889

*Attorney for the Plaintiff*